IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

TIMOTHY ELLIS,                        )
                                      )
              Plaintiff,              )
                                      )        2:18-cv-01442
      v.                              )
                                      )
WESTINGHOUSE ELECTRIC                 )
COMPANY, LLC,                         )
                                      )
              Defendant.              )

## OPINION

**Mark R. Hornak, Chief United States District Judge**

The matter before the Court presents a Gordian Knot of bankruptcy law entangled with an employment discrimination claim, spanning different courts in two jurisdictions, and the tension between those legal frameworks and tribunals. Boiled down, the Court must resolve the Defendant Westinghouse Electric Company's ("WEC" or "the Defendant") Motion for Summary Judgment, which argues that Timothy Ellis' ("the Plaintiff") age discrimination claims asserted in this Court were discharged by the Defendant's Chapter 11 bankruptcy proceeding in the Southern District of New York. (ECF No. 31.) For the reasons that follow, the Court will deny the Defendant's Motion.[1]

## I.    PROCEDURAL POSTURE

Beginning with the Defendant's bankruptcy proceedings, WEC filed its Chapter 11 bankruptcy petition in March of 2017 in the United States Bankruptcy Court for the Southern

---

[1] And, because it became apparent that the issues central to the Defendant's Summary Judgment Motion were ones of law, the Court gave notice to the parties, (ECF No. 47), that it reserved the right to grant summary judgment in favor of the Plaintiff if it determined that there were no genuine issues of material fact, and the Plaintiff was entitled to judgment in its favor as a matter of law on the question of whether his claims as asserted in this Court were barred or discharged by the Defendant's bankruptcy. Because the Court concludes that that standard has been met on this issue, summary judgment will be granted in favor of the Plaintiff as to these issues.

1

District of New York ("the bankruptcy court"). *In re Westinghouse Electric Co., LLC*, No. 17-10751-MEW (Bankr. S.D.N.Y. filed Mar. 29, 2017), ECF No. 1 [hereinafter *WEC Bankr.*"]. In June of that year, the bankruptcy court entered an order establishing a deadline for filing proofs of claims against WEC. *Id.*, ECF No. 788. About two weeks later, WEC filed an affidavit of service with the bankruptcy court affirming that notice of the proofs-of-claim deadline was sent to, among others, potential creditors to include the Plaintiff. *Id.*, ECF No. 881, Ex. F, at 166. Then in February 2018, the bankruptcy court entered notice of the hearing on confirmation for the bankruptcy reorganization plan ("the Plan") with procedures on how to file objections to the Plan. *Id.*, ECF No. 2644. Notice of the same was served on potential creditors, including the Plaintiff. *Id.*, ECF No. 2802, Ex. J, at 164. The Plan was confirmed on March 28, 2018, when the bankruptcy court entered its Findings of Fact, Conclusions of Law, and Order Confirming Modified Second Amended Joint Plan of Reorganization ("Confirmation Order"). *Id.*, ECF No. 2988. The Confirmation Order and the Plan appended to it set several conditions precedent for the Plan's Effective Date. *Id.*, ECF No. 2988-1, at 41–42. After those conditions were met several months later, a period of time which is of critical importance in the matter before this Court, notice of the occurrence of the Effective Date was filed on August 1, 2018. *Id.*, ECF No. 3705. As before, this notice was also served on potential creditors, including the Plaintiff. *Id.*, ECF No. 3724, Ex. D, at 269.

With respect to the matter here, the Plaintiff filed his Complaint on October 26, 2018. (ECF No. 1.) In January 2019, the Parties agreed to stay the case pending exhaustion of administrative remedies for the Plaintiff's supplemental state law discrimination claim. (ECF No. 8.) The case was not reopened until July 25, 2019. (ECF No. 15.) The Defendant filed its Answer and the Court held an initial case management conference in September 2019, which stalled almost immediately

when the Defendant for the first time raised during that conference the bankruptcy issue now before the Court. (ECF Nos. 18, 24.) The instant Motion for Summary Judgment was filed a short time later in November 2019. (ECF No. 31.)

A week after the Motion was filed, the Defendant filed Notice on the docket alerting the Court that it had also filed a parallel motion in the bankruptcy court in New York, seeking to enjoin the Plaintiff from prosecuting his claim against WEC in this Court. (ECF No. 35.) This resulted in an emergency motion by the Plaintiff asking this Court to stay the "duplicative" bankruptcy motion in the New York bankruptcy court. (ECF No. 36.) After this Court held a hearing on the issue, the Defendant voluntarily continued the proceeding in the bankruptcy court until January 22, 2020. (ECF No. 40.) Accordingly, the Court dismissed the Plaintiff's emergency motion without prejudice as moot and set a briefing schedule to address the Defendant's Motion for Summary Judgment. (ECF No. 41.) Upon receiving a Response, Reply, and Sur-Reply, the Court heard oral argument on January 15, 2020. (ECF No. 54.) During argument, the Court advised the Defendant that it would not acquiesce to the deadline the Defendant had effectively set for the Court to decide the matter in light of the short fuse resulting from the parallel proceedings in S.D.N.Y. The Court stated its intention to enjoin those proceedings if necessary to provide this Court a reasonable amount of time to address the Motion here.[2] The Defendant thereafter filed a Notice that the proceedings in the New York bankruptcy court were voluntarily continued indefinitely. (ECF No. 56.) Finally, after supplemental briefing on certain discrete issues, this matter became ripe for disposition. (ECF Nos. 57–60.)

---

[2] The Court notes that as a practical matter, the Defendant could have withdrawn the instant Motion and proceeded in the bankruptcy court in Manhattan alone, assuming that the bankruptcy court maintains jurisdiction to enjoin this matter, as the Defendant contended that it did and as the Plaintiff vigorously contended it did not due the application of a variant of the "first filed rule" in light of the proceedings in this Court. Be that as it may, the Defendant nonetheless elected to proceed with its Motion here. So the Court advised the parties that it would act to ensure its ability to properly resolve the issues that the parties put before this Court.

## II.    LEGAL STANDARD

Summary judgment will be granted when there are no genuine issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). To withstand a summary judgment motion, an issue of fact in dispute must be both genuine and material, i.e., one upon which a reasonable factfinder could base a verdict for the non-moving party and one which is essential to establishing the claim. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). When considering a summary judgment motion, the Court may not weigh the evidence or make credibility determinations. *Id.*

If the moving party carries its initial burden under Rule 56, the non-movant must identify "specific facts which demonstrate that there exists a genuine issue for trial." *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir. 1996) (citing *Celotex*, 477 U.S. at 323). They must respond "by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643 n.3 (3d Cir. 1998). Where there are no disputed material facts and the question presented is one of pure law, the undisputed evidence must still be construed in the light most favorable to the non-movant. *Rea v. Cincinnati Ins. Co.*, No. CIV.A. 3:13-21, 2014 WL 4198059, at *4 (W.D. Pa. Aug. 22, 2014).

The facts material to the Defendant's Motion are for the most part undisputed. While the Defendant denies all facts underpinning the Plaintiff's age discrimination claims, (*see* Answer, ECF No. 18), for purposes of the instant Motion the Defendant essentially argues that, even if the Plaintiff's claims are valid, he is barred from asserting them in this Court by virtue of the bankruptcy proceedings in New York. (ECF No. 32, at 9 n.7.) Thus, the Court is left to resolve the

4

legal question of whether the Plaintiff's employment discrimination claims in this Court are completely barred or discharged by the Defendant's bankruptcy.

## III.   STATEMENT OF THE FACTS

Some fourteen (14) months after WEC filed its bankruptcy petition and two (2) months after the Defendant's bankruptcy plan was confirmed by the bankruptcy court, the Plaintiff's employment with WEC was terminated on or about May 31, 2018. (Complaint, ECF No. 1, at 2.) As outlined above, the bankruptcy petition was filed on March 29, 2017, Plan was confirmed on March 28, 2018, and became effective by its terms on August 1, 2018. The Plaintiff's claim therefore arose post-petition, post-Confirmation and pre-Effective-Date.[3] During the pendency of the bankruptcy action, the Defendant caused to be served on the Plaintiff three pertinent notices: (1) Notice of Deadline for Filing Proofs of Claim, served before the Plaintiff was fired; (2) Notice of Hearing on Confirmation of Plan and Procedures for Objecting to the Confirmation of Plan, also served before the Plaintiff's discharge from employment; and (3) Notice of Effective Date of the Plan, served after the Plaintiff was dismissed. *See supra* Procedural Posture, Part I (demonstrating that the affidavits of service included the Plaintiff's name as a recipient).

The first Notice of Deadline for Filing Proofs of Claim provided that a potential claimant, other than a "governmental unit" as defined by the Bankruptcy Code, must assert a prepetition claim by filing a Proof of Claim by September 1, 2017—the "General Bar Date." (ECF No. 34-2, at 3.) The second Notice of Hearing on Confirmation of Plan and Procedures for Objecting to the Confirmation of Plan provided that a "Confirmation Hearing" would occur on March 27, 2018, and detailed the procedures for voting and filing objections to the then-proposed bankruptcy plan.

---

[3] The Defendant avers, and the Plaintiff agrees, (ECF No. 45, ¶ 34), that May 31, 2018 is the date upon which the claim arises for purposes of the Plaintiff's discrimination claims. *Anderson v. Acme Markets, Inc.*, 287 B.R. 624, 630 (E.D. Pa. 2002) ("[a]n employment discrimination suit accrues as of the date of the alleged adverse employment action").

(ECF No. 34-4, at 3–5.) The Plan was later confirmed by the bankruptcy court on March 28, 2018. The Confirmation Order and the Plan set an Effective Date, which would be the date in the future when "all conditions to the effectiveness of the Plan set forth in Section 10 hereof have been satisfied or waived in accordance with the terms of the Plan." (ECF No. 34-7, § 1.60 [hereinafter "Plan"].) During this period, after the Plan was confirmed but before the Effective Date had occurred, the Defendant terminated the Plaintiff's employment. The third Notice of the Effective Date of the Plan was sent after the conditions precedent for the Effective Date had been met and the Effective Date had thus occurred. This Notice provided that the Effective Date of the Plan was August 1, 2018 and that "all requests for payment of Administrative Expense Claims must be filed and served on the Debtors **no later than August 31, 2018**"—the so-called "Administrative Expense Claims Bar Date." (ECF Nos. 34-8, at 3 (emphasis in original); 34-9, at 2; *see also* Plan, § 1.3 (defining the Administrative Expense Claims Bar Date as "the first Business Day that is 30 days following the Effective Date").) The Notice further provides that:

> Holders of Administrative Expense Claims that . . . do not file and serve such a request by the Administrative Expense Claims Bar Date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors, or their property and such Administrative Expense Claims shall be deemed discharged as of the Effective Date.

(*Id.*) An Administrative Expense Claim is defined in the Plan as:

> any Claim against a Debtor for payment of an administrative expense of a kind specified in section 503(b) of the Bankruptcy Code and entitled to priority or superpriority pursuant to sections 364(c)(1), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses (such as wages, salaries, or commissions for service rendered after the Petition Date, and payments for goods and other services), (b) all fees and charges assessed against the Estates pursuant to sections 1911 through 1930 of chapter 123 of the title 28 of the United States Code, 28 U.S.C. §§1-1401, and (c) all Allowed Claims that are to be

6

> treated as Administrative Expense Claims pursuant to a Final Order
> of the Bankruptcy Court under section 546(c)(2) of the Bankruptcy
> Code.

(Plan, § 1.2.) An Affidavit of Service for the Notice of the Effective Date of the Plan was filed

with the bankruptcy court on August 9, 2018, certifying that the Notice was mailed on August 2

to the exhibited list of recipients. *WEC Bankr.*, ECF No. 3724. The period of time between the

Confirmation Order and the Effective Date, roughly four (4) months, was due primarily to the time

it took to consummate a $3.8 billion stock sale of WEC and some of its subsidiaries under a Plan

Funding Agreement, which was  a "key condition" to the Effective Date. (ECF No. 32, at 4.) No

party avers that the Plaintiff had any ability to influence the occurrence of that condition, or the

setting of the Effective Date.

The Plaintiff admits receiving the first two Notices, but does not admit receiving the third

Notice, which contained notice of the Effective Date and the Administrative Expense Claims Bar

Date. (Pl. Resp., ECF No. 44, at 10.) However, as noted above, the Plaintiff was listed as a recipient

in the Affidavits of Service for all three Notices. Further, he admits to reviewing "all mail

addressed to him and received at his home." (Pl.'s Counter Statement of Material Facts, ECF No.

45, ¶ 36.) In a supplemental filing, the Defendant provided an affidavit affirming that all three

notices were sent to the Plaintiff's home address and that none of them were returned

undeliverable. (ECF No. 50-1, at 2–3.) The Plaintiff also avers that the Defendant did not cause a

copy of the Notice of the Effective Date to be served on his counsel, which the Defendant does not

deny. At the time, the Plaintiff's lawyer was already representing him in connection with the

charge the Defendant had filed with the Equal Employment Opportunity Commission ("EEOC")

and served on the Defendant. (ECF No. 45, ¶¶ 39–42.) The Defendant responds that Plaintiff's

counsel was aware of the Notice of the Effective Date because his law firm entered an appearance

on behalf of another creditor in WEC's bankruptcy matter. (ECF No. 49, ¶ 39; *see also* ECF No.

50-2, at 6 (excerpting the Affidavit of Service filed in the bankruptcy court and listing Plaintiff's

counsel's law firm as a recipient on behalf of another creditor).) The Defendant also avers that the

Plaintiff never filed a request to have Notices sent to an authorized agent, as would be required to

have any Notices sent to his lawyer under Bankruptcy Rule 2002(g). (ECF No. 49, ¶ 42.)

 In addition, the Plaintiff claims to have brought the second Notice[4] to the Defendant's

Human Resources ("HR") Director. (ECF No. 44, at 13.) The Defendant's HR Director

purportedly told the Plaintiff that the Defendant's bankruptcy did not involve him and therefore

the Notice did not apply to him. (*Id.*) This allegedly occurred on or about March 12, 2018, about

two and a half months *before* the Plaintiff's employment was terminated.

 The Confirmation Order and the Plan contain several terms and provisions which the

Defendant says discharges the Plaintiff's claims. Section 11.3 of the Plan, as adopted by the

bankruptcy court in the Confirmation Order, dealt with the discharge of claims:

> Except as otherwise expressly provided in the Plan, upon the
> Effective Date, in consideration of the distributions to be made
> under the Plan, each holder of a Claim or Interest and any Affiliate
> of such holder shall be deemed to have forever waived, released and
> discharged the Debtors, Wind Down Co, and the Reorganized
> Debtors, to the fullest extent permitted by section 1141 of the
> Bankruptcy Code, of and from any and all Claims, Interests, rights
> and liabilities that arose prior to the Effective Date; *provided,
> however*, that the DIP Claims shall not be waived, released and
> discharged unless and until the DIP Claims are indefeasibly repaid
> in full in Cash in accordance with Section 2.4. Upon the Effective
> Date, all such persons shall be forever precluded and enjoined,
> pursuant to section 524 of the Bankruptcy Code, from prosecuting
> or asserting any such discharged Claim or Interest against the
> Debtors, Wind Down Co and the Reorganized Debtors.

(Plan, § 11.3 (emphasis in original).) The "Debtors" include, among many other entities and

subsidiaries, Westinghouse Electric Company LLC (the Defendant). (Plan, § 1.43.) "Reorganized

---

[4] The "Notice of Hearing on Confirmation of Plan and Procedures for Objecting to the Confirmation of Plan."

Debtor" or "Reorganized Debtors" refer to "individually, any Debtor and, collectively, all Debtors, in each case as reorganized under the Plan from and after the Effective Date." (*Id.* § 1.120.) A "Claim" is defined to have the meaning set forth in section 101(5) of the Bankruptcy Code. (*Id.* § 1.28.) That Code section defines a claim as a:

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or
> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(5). Any such claims are discharged, as stated in the Plan, to the extent permissible under section 1141 of the Bankruptcy Code. (Plan, § 11.3.) The Plan also contains language (1) barring and enjoining any Administrative Expense Claims filed after the Administrative Expense Claims Bar Date, (Plan, § 2.1); (2) discharging Claims and terminating Interests, (Plan, § 11.1); and (3) providing releases by Holders of Claims and Interests, (Plan, § 11.7). The Plan also enjoins any Holder of a Claim from bringing any action against the Debtors discharged under the terms of the Plan and Confirmation Order.

> **EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, FROM AND AFTER THE EFFECTIVE DATE, (1) TO THE EXTENT A PARTY'S CLAIM IS DISCHARGED PURSUANT TO THE PLAN OR CONFIRMATION ORDER, SUCH PARTY SHALL BE PERMANENTLY ENJOINED FROM PUSUING [sic] SUCH CLAIM AGAINST THE PARTIES THAT HAVE BEEN DISCHARGED PURSUANT TO THE PLAN OR CONFIRMATION ORDER, AND (2) TO THE EXTENT A PARTY'S CLAIM HAS BEEN RELEASED PURSUANT TO THE PLAN OR CONFIRMATION ORDER, SUCH RELEASING PARTY SHALL BE PERMANENTLY ENJOINED FROM PURSUING SUCH CLAIM AGAINST THE APPLICABLE RELEASED PARTY . . .**

(Plan, § 11.9 (emphasis in original).)

In light of the fact that his employment was terminated after the bankruptcy court entered its Confirmation Order, the Plaintiff did not file a Proof of Claim by the General Bar Date—which occurred some nine (9) months prior to the date his claim arose on May 31, 2018. He also filed no objections to the Plan in time for the Confirmation Hearing on March 27, 2018—some two (2) months before his claim arose. This is not surprising. At each of those points, the Plaintiff had no reason to believe that he had any claim against the Defendant because by not having yet been fired from his job, he had no such claims. However, the Plaintiff also failed to file a request for payment of an administrative expense claim by the August 31, 2018 Administrative Expense Claims Bar Date. This was in spite the fact that his discrimination claim arose about two (2) months before the Effective Date of August 1, 2018, and three (3) months before the Administrative Expense Claims Bar Date.

Instead, the Plaintiff filed an administrative discrimination charge with the EEOC on or about July 3, 2018 and the Defendant was served with the charge on or about the same day. (ECF No. 45, ¶ 39.) The Plaintiff avers that the Defendant thereafter defended against the charge prior to the Effective Date on August 1, 2018. (*Id.* ¶ 41.) However, the Defendant says it did not actually receive the charge until July 31, 2018, one (1) day before the Effective Date. (ECF No. 49, ¶ 41.) In any case, after the Complaint was filed in this Court and this case was stayed for approximately seven (7) months to allow for the exhaustion of certain state law administrative remedies related to the underlying discrimination claims, (ECF Nos. 8, 10), the issue of the Defendant's bankruptcy was raised to the Court for the first time by the Defendant in the initial case management conference, (ECF No. 24). There were no defenses or issues relative to the effect of the bankruptcy on the Plaintiff's claims in the Defendant's Answer. Specifically, no defense was asserted that the

Plaintiff's claims were discharged by the bankruptcy, or otherwise barred by the Plan. (ECF No. 18.); *see* Fed. R. Civ. P. 8(c)(1).

## IV.   DISCUSSION & ANALYSIS

The Plaintiff argues that either the notice of the Administrative Expense Claims Bar Date was deficient or that the Bankruptcy Code via the Plan does not discharge his claims mainly because his claims arose after Plan confirmation. The Defendant argues that notice was proper and that either or both of section 503 and section 1141 of the Bankruptcy Code discharge its liability for the Plaintiff's claims mainly because they arose prior to the Plan's Effective Date. The arguments of each party are appealing in their directness and simplicity. However, upon consideration of the record and applicable law, the Court concludes that the answers here are not nearly as straightforward as either party posits. Upon consideration of the record and the arguments of the parties, the Court concludes that the notices provided to the Plaintiff were not (as he argues) defective, but that the Bankruptcy Code does not discharge the Plaintiff's post-confirmation employment discrimination claims in the circumstances of this case.

### 1.   Notice

It appears to the Court that there are three (3) issues relating to notice advanced by the Plaintiff. First, the Plaintiff avers that the Defendant failed to provide actual or constructive notice of the Effective Date and Administrative Expense Claims Bar Date. The Plaintiff further argues that whether he received proper notice is a question of fact for the jury. As discussed, the Plaintiff admits receiving the first two Notices, but not the third Notice regarding the Effective Date and Administrative Expense Claims Bar Date. Specifically, the Plaintiff does not "recall" receiving that third notice. (ECF No. 44, at 10.)

There is a well-established rebuttable presumption that notice was received by an addressee when the party seeking the presumption provides evidence that that the notice was actually mailed. *In re Dalton*, No. BR 12-20004 JKF, 2012 WL 3648139, at *1 n.1 (W.D. Pa. Aug. 23, 2012) (citing *Philadelphia Marine Trade Association–International Longshoremen's Ass'n Pension Fund v. C.I.R.*, 523 F.3d 140, 147 (3d Cir. 2008) (citing *Rosenthal v. Walker*, 111 U.S. 185 (1884); *Hagner v. United States*, 285 U.S. 427 (1932))).

WEC provided an affidavit of the Director of WEC's claims and noticing agent, KCC. (ECF No. 50-1.) The affidavit states under penalty of perjury that KCC sent all three (3) Notices to the Plaintiff by First Class Mail. (*Id.*) Further, KCC's Director affirms that KCC sent all three (3) Notices to the same address—the address at which the Plaintiff admits receiving the first two (2) Notices. (*Id.*) The affidavit also avers that none were returned as undeliverable. (*Id.*)

Generally, once a party seeking the presumption shows (through an affidavit) that notice was timely and accurately sent to a creditor, the presumption of receipt arises and the burden shifts to the other party to provide some objective evidence *beyond  a bald statement of non-receipt*. *Peralta,* 599 B.R. 759, 763 n.5 (Bankr. D.N.J. 2019); *In re Johnson*, No. 02-34686-SR, 2004 WL 5856051, at *3 n.3 (Bankr. E.D. Pa. Dec. 2, 2004); *In re Barquet Grp., Inc.*, 477 B.R. 454, 462 n.7 (Bankr. S.D.N.Y. 2012). The Plaintiff here offers no evidence to rebut these claims other than his inability to "recall" receiving the notice despite reviewing "all mail that is delivered to [his] home," including "every piece of mail sent to [him] in August 2018." (Ellis Aff., ECF No. 46-1, ¶ 7.). Thus, he has not provided evidence sufficient to rebut the presumption of receipt.

This stringent approach to the bankruptcy version of this receipt rule is predicated on avoiding conflict with bankruptcy law. The United States Bankruptcy Court for the Eastern District of New York observed:

> To apply a weaker presumption of receipt to notices sent by mail in bankruptcy cases would, moreover, be at odds with the Bankruptcy Rules, which prescribe service of notices by mail, and define mail as "first class, postage prepaid." It would mean that, where a bar order or other notice is served in accordance with the Bankruptcy Rules, any party could potentially avoid the effect of failure to meet the deadline by claiming non-receipt. This would defeat, or at least substantially undermine, the purpose of the noticing scheme established under the Bankruptcy Code and Bankruptcy Rules.

*In re Greenberg*, 526 B.R. 101, 107–08 (Bankr. E.D.N.Y. 2015) (citations omitted) (citing Fed. R. Bankr. P. 2002; 9001(8)); *see In re A&P*, 604 B.R. 650, 658 (Bankr. S.D.N.Y. 2019)). Thus, even viewing the evidence in the light most favorable to the Plaintiff under the rule's presumption of receipt, a presumption that the record does not demonstrate has been rebutted, the Court presumes that the Plaintiff was provided with the third notice, that is Notice of the Effective Date of the Plan.[5]

---

[5] The Court does note a nuance with regard to this rule in the Third Circuit. Unlike the bankruptcy cases cited above, the Third Circuit sometimes applies a different, two-tiered rule. As before, once the party seeking the presumption proves mailing, "the presumption of receipt imposes the burden of production on the party against whom it is directed." *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 320 (3d Cir. 2014) (quotations and alterations omitted) (citing *McCann v. Newman Irrevocable Trust*, 458 F.3d 281, 287 (3d Cir. 2006)). However, the Third Circuit has held that the presumption is "weaker" when the delivery is sent by regular mail rather than by certified mail, which would generate a receipt or other proof of delivery. *Id.* at 319. Viewed in the light most favorable to the Plaintiff, the Defendant would not be afforded the "strong presumption" associated with certified mail, *see id.*, because neither the affidavit by KCC's Director nor the affidavit of service filed in the bankruptcy court state that the Notice was sent by certified or registered mail, (*see* ECF Nos. 50-1, 50-2). Thus, the quantum of evidence to overcome the presumption and to defeat summary judgment under this rule would be "minimal" and could "consist solely of the addressee's positive denial of receipt [through sworn affidavit], creating an issue of fact for the jury." *Lupyan*, 761 F.3d at 320–21. The same would hold true "even if the affidavit is 'self-serving.'" *Id.* at 321 (citing *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 F.3d 156, 161–63 (3d Cir. 2009)). However, *Lupyan* addressed a Family and Medical Leave Act ("FMLA") claim and based this weaker presumption at least in part on the fact that "there is no language in the FMLA or its regulations that suggests a legislative intent to create a stronger presumption there than would otherwise apply in under [sic] Rule 301." *Id.* at 321 (referring to Fed. R. Evid. 301, "Presumptions in Civil Cases Generally"). The Third Circuit has applied this weaker presumption in the Truth in Lending Act ("TILA"), immigration, and equitable liens contexts as well. *Cappuccio v. Prime Capital Funding LLC*, 649 F.3d 180, 190 (3d Cir. 2011) (TILA); *Santana Gonzalez v. Attorney Gen. of U.S.*, 506 F.3d 274, 279 (3d Cir. 2007) (immigration proceedings); *U.S. Renal Care Inc. v. WellSpan Health*, 709 F. App'x 160, 162 (3d Cir. 2018) (equitable lien). The Court is unable to identify a Third Circuit case applying this weakened presumption to bankruptcy. Thus, as the Third Circuit did in *Lupyan*, this Court looks to the principles of the Bankruptcy Code and agrees with the *Greenberg* Court that a weaker presumption would be at odds with the noticing scheme established by Congress in the Bankruptcy Code. *In re Greenberg*, 526 B.R. at 107–08. In addition, here the Plaintiff has not offered a "positive statement of denial of receipt" but has instead simply stated that he did not "recall" receiving it. For all of these reasons, a weaker presumption for non-registered mail is not applicable in this context.

The second issue as to notice is, presuming the Plaintiff received the Third Notice, whether it was insufficient either (1) because it failed to satisfy the requirements of due process or (2) due to the actions of WEC's HR Director. With respect to due process, the Plaintiff notes that the Notice did not mention Administrative Expense Claims on the first page or identify him as a holder of such a claim. (ECF No. 44, at 11.) Furthermore, he says that the term "Administrative Expense Claim" is left undefined and the Administrative Expense Claims Bar Date is "hidden" in the middle of the second page. (*Id.* at 11–12.) Lastly, he says the language is overly broad and not reasonably calculated to put the Plaintiff, a layperson, on notice of his rights under the Plan. (*Id.* at 11.) The Plaintiff, however, cites no case law to support these alleged constitutional deficiencies.

The Third Circuit has held that a plaintiff's "degree of sophistication is an issue that is relevant to the adequacy of the notice of bankruptcy proceedings they received." *Jones v. Chemetron Corp.*, 212 F.3d 199, 205 n.6 (3d Cir. 2000) (citing *In re Grand Union Co.*, 204 B.R. 864, 872, 880 (Bankr. D. Del.1997)). While it may be assumed that the majority of the population is unfamiliar with and untrained in the intricacies of bankruptcy law, that issue on its own is not enough to defeat proper notice. *See Peralta,* 599 B.R. at 764. Furthermore, the Plaintiff had already retained counsel in the related matter of filing a charge with the EEOC. Thus, he could have reasonably consulted with his lawyer about the import of the Notice. *Id.* at 764–65 ("The fact remains that the notice Movants received was sufficient to prompt them to seek the advice of a legal professional. Accordingly, the notice was adequate and Movants were not denied due process in these bankruptcy proceedings."); *see also In re Bi-Lo, LLC*, No. 09-02140 HB, 2010 WL 3340521, at *6 (Bankr. D.S.C. Feb. 2, 2010) ("it is not unreasonable to expect a party, sophisticated or not, to contact his or her attorney regarding information received via mail in either form, and

the notice given supplied adequate time to do so"). Thus, the Court will not conclude that the notice was constitutionally deficient on this basis.

The Plaintiff also avers that around March 12, 2018 he brought the Notice of Hearing on Confirmation of Plan and Procedures for Objecting to the Confirmation of Plan ("the Second Notice") to the Defendant's HR Director. (ECF No. 44, at 13.) She allegedly informed him that he did not need to take any action because the Defendant's bankruptcy, and therefore the Second Notice, had nothing to do with him.[6] (*Id.*; *see also* Ellis Aff., ECF No. 46-1, ¶ 6.) The Plaintiff argues that this had the effect of misleading him and vitiating the later notice of the Administrative Expense Claims Bar Date. (ECF No. 44, at 12 (citing *In re Collier*, 307 B.R. 20, 25–26 (Bankr. D. Mass. 2004)).) However, the Court concludes that the alleged actions by the Defendant's agent would not vitiate the later Notice.

The *Collier* case that the Plaintiff cites involved a debtor sending creditors a "cover sheet" containing highly misleading language, which the Court held obfuscated the earlier notice of the bar date. 307 B.R. at 27. Thus, the sufficiency of the *previous* notice was destroyed. However, the argument here is that the HR Director's actions rendered the *later* third notice defective. The Defendant cogently retorts that constitutionally sufficient notice cannot be so easily viewed as having been "pre-obfuscated." (ECF No. 48, at 15.) Neither party provides any case law directly addressing the notion of "pre-obfuscation" and the Court cannot uncover any either. However, the Court finds no basis here to conclude that the actions of the H.R. Director rendered the later Notice constitutionally infirm. The *Collier* Court stated that "[t]he only relevant question is whether the actions of the Debtor, intentional or not, so affected notice of the bar date that a creditor was denied due process," and said that such must be analyzed under a totality of the circumstances. *Collier*,

---

[6] The record does not reflect why the Plaintiff was placed on the creditor mailing list to receive these Notices relating to the Defendant's bankruptcy, and no party advances any contentions in such regards.

307 B.R. at 26. However, the events here, viewed in their totality, do not weigh in favor of a similar finding. The Court concludes that the HR Director could not have caused the later Notice to be ineffective given the fact that (1) the Court does not find, and the Plaintiff does not aver, that the later Notice contained any false or misleading statements of a similar kind to those in *Collier* and (2) to the extent the alleged comments of the HR Director could have caused the Plaintiff to lower his guard, the Plaintiff was, at the time he received the third notice, represented by counsel with whom he could have consulted upon receiving the later Notice. *Peralta,* 599 B.R. at 764–65.

The final notice issue is whether the Defendant was required to send the Notice of the Effective Date to the Plaintiff's attorney, rather than to him. This argument is of no moment as "[t]here is simply no basis in the Bankruptcy Code or Rules for requiring service on a creditor's attorney." *Peralta,* 599 B.R. at 766 (citing *In re Stauffer*, 378 B.R. 333, 338 (Bankr. D. Utah 2006)). In order to have notices sent to an address other than that of the creditor, Bankruptcy Rule 2002(g) requires a creditor to file a notice in the bankruptcy court. Fed. R. Bankr. P. 2002(g). "Most courts have not interpreted [Rule] 2002(g) to require debtors to serve creditors' counsel, even in instances when debtors knew counsel represented creditors in pre-petition matters regarding the debt in question." *Peralta*, 599 B.R. at 766 (alteration omitted) (citing *In re Brunswick Baptist Church*, No. 03-13719, 2007 WL 160749, at *3 (N.D.N.Y. Jan. 16, 2007) (collecting cases); *In re Bi-Lo, LLC*, No. 09-02140, 2010 WL 3340521, at *5). For all of the forgoing reasons, the Court concludes as a matter of law that notice was proper.

### 2.  **Discharge**

The remaining question is whether the Plaintiff's claims were discharged by operation of the Plan and Confirmation Order, and whether he is thus permanently enjoined from pursuing those claims here or anywhere else. As the Defendant points out repeatedly, "[t]he principal

purpose of the Bankruptcy Code is to grant a fresh start to the honest but unfortunate debtor." (*See e.g.* ECF No. 32, at 9 (quoting *Marrama v. Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007)).) The results of bankruptcy can be "harsh," both to debtors and creditors, but the Bankruptcy Code's procedures and deadlines must strike "a delicate balance between the competing interests of creditors pursuing their claims and debtors in obtaining a fresh start and finality." *In re Bugarenko*, 373 B.R. 394, 400 (Bankr. E.D. Pa. 2007). The Defendant argues that the allegedly harsh outcome of dismissing the Plaintiff's federal and state discrimination claims is exactly the result contemplated by the Bankruptcy Code in striking that balance. Importantly, the Defendant contends that both of sections 503 and 1141 lead to this result, and the Court must and will consider the application of those provisions separately.

On the other hand, the Plaintiff argues that the Defendant is looking for a windfall, not a fresh start, when it comes to him and the disposition of the Plaintiff's claims. He argues that the Bankruptcy Code (either or both of sections 503 and 1141) and the Plan by their terms do not and *cannot* discharge a discrimination claim that arises after plan confirmation, but before the effective date. For the following reasons, the Court concludes that while the Plaintiff's argument overstates the principles of bankruptcy law at issue here, the Plaintiff's claims in this specific case nonetheless were not discharged by virtue of the cited provisions of the Bankruptcy Code.

### a. *Section 503*

The Defendant argues that either 11 U.S.C. § 503 or 11 U.S.C. § 1141, or both, discharge and bar the Plaintiff's claims. The Court will consider the section 503 arguments first.

Section 503 pertains to the allowance of "administrative expense claims." Ordinarily, section 503 gives creditors payment priority for these claims, which arise post-petition and constitute actual and necessary costs of preserving the bankruptcy estate. *In re Goody's Family*

*Clothing Inc.*, 610 F.3d 812, 817 (3d Cir. 2010). The Plan defines Administrative Expense Claims, in part, as those claims against the Debtor "specified in section 503(b)." (Plan, § 1.2.) Section 503(b) reads, in relevant part:

> (b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including—
> (1)
> (A) the actual, necessary costs and expenses of preserving the estate . . .

However, the full definition in the Plan includes a period of time applicable to administrative expense claims— "the actual and necessary costs and expenses *incurred on or after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses* (such as wages, salaries, or commissions for service rendered after the Petition Date, and payments for goods and other services)." (Plan, § 1.2 (emphasis added).)

The Defendant argues that the Plaintiff's claims[7] fall under the umbrella of administrative expense claims under the Bankruptcy Code. The "general rule" for administrative expense claims under section 503(b) is that the claimed expense "must (a) confer an actual and demonstrable benefit on the debtor's estate, the creditors, and to the extent relevant, the stockholders, and (b) arise from a transaction with a bankruptcy estate." *Sanchez v. Nw. Airlines, Inc.*, 659 F.3d 671, 677 (8th Cir. 2011) (citations, quotations, and alterations omitted); *see also Pennsylvania Dep't of Envtl. Res. v. Tri-State Clinical Labs., Inc.*, 178 F.3d 685, 689–90 (3d Cir. 1999) [hereinafter *Pa. DER*] ("Thus, the language of § 503(b), read as a whole, suggests a quid pro quo pursuant to which the estate accrues a debt in exchange for some consideration necessary to the operation or

---

[7] "Claim" under the Bankruptcy Code is defined broadly to include, "right(s) to payment" and "right(s) to an equitable remedy for breach of performance." 11 U.S.C. § 101(5). "Under this broad definition of claim, all legal obligations of the debtor, no matter how remote or contingent, will be able to be dealt with in the bankruptcy case." *In re First Jersey Sec., Inc.*, 180 F.3d 504, 510 (3d Cir. 1999) (internal quotations omitted).

rehabilitation of the estate."). On their face, the Plaintiff's claims here do not fit this mold. His allegations that the Defendant discriminated against him based on his age did not arise from any "transaction" with the estate, nor was any "benefit" conferred upon the estate, creditors, or stockholders by virtue of this alleged discrimination.

However, the Supreme Court and several Courts of Appeals have held that administrative expense claims can also encompass tort and other claims arising during the pendency of Chapter 11 proceedings. The Supreme Court in *Reading Company v. Brown*, 391 U.S. 471, 483–85 (1968), held that "actual and necessary costs" of preserving the bankruptcy estate can include tort claims for damages caused by a receiver's negligence. Such is the case because tort claims against the estate constitute "costs ordinarily incident to [the] operation of a business." *Id.* at 483. This pre-Bankruptcy Code Opinion has survived the Code's enactment in 1978 and has since been expanded to include other types of claims. To wit, some courts have held that employment discrimination claims like the Plaintiff's, in addition to tort claims, can be brought as administrative expense claims under *Reading*. In *In re Zilog*, the Court of Appeals for the Ninth Circuit observed that "under *Reading* and its progeny, discrimination claims that arise post-petition but pre-confirmation can be filed as administrative expenses against the debtor's estate." 450 F.3d 996, 999 n.1 (9th Cir. 2006). The plaintiffs there alleged, in part, sex discrimination claims against the debtor. *Id.* at 999.

Thus, *Reading* operates as an exception or at least an explanation as to section 503's usual requirements of a transaction with and to benefit to the estate. What cases like *Reading* and *Zilog* do not resolve, however, is the validity of the two central premises of the Defendant's section 503 argument. First, while pre-confirmation employment discrimination claims can be advanced as administrative claims, can *post*-confirmation claims also be brought as administrative claims? Second, if the answer to that question is "yes", then the next question is whether they *must* be

brought as administrative claims or suffer being discharged by virtue of section 503? As discussed below, the former premise appears to be correct. But the Court concludes as to the second premise, such does not require that the claims here be so asserted or face discharge by operation of section 503.

### *Post-Confirmation Claims as Administrative Expenses*

Administrative expense claims, by definition, must relate to the preservation of the bankruptcy estate. *See* 11 U.S.C. § 503(b)(1)(A). By default, confirmation of the plan "vests all of the property of the estate in the debtor," unless otherwise provided in the confirmation order or plan. 11 U.S.C. § 1141(b). Thus, confirmation typically closes the door on any further administrative expense claims because the estate ceases to exist. However, where a plan specifies that the estate will vest on a later effective date, some courts have held that post-confirmation claims can be brought as administrative expenses if those claims arose before the effective date, while the bankruptcy estate was still in existence. *In re WorldCom, Inc.*, No. 02-13533(AJG), 2009 WL 2959457, at *3 (Bankr. S.D.N.Y. May 19, 2009); *Hillis Motors, Inc. v. Hawaii Auto. Dealers' Ass'n*, 997 F.2d 581, 588 (9th Cir. 1993).

Here, the Plan does specify a post-confirmation vesting date:

> **On the Effective Date**, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, **all property of the Debtors' Estates . . . shall vest in the Reorganized Debtors free and clear of all Claims**, liens, encumbrances, charges and other interests.

(Plan, § 5.1 (emphasis added).) Therefore, the Plaintiff's post-confirmation, but *pre-effective-date* claims arose when the Defendant's bankruptcy estate was still in existence. Thus, the Defendant says that according to the reasoning in *WorldCom* and cases like it, the Plaintiff's claims are "subject to classification as an administrative expense, i.e., an actual, necessary cost and expense of preserving [the] estate." *WorldCom*, 2009 WL 2959457, at *3. Proceeding on this logic, which

is the essence of the Defendant's section 503 argument, it appears that the Plaintiff *could have*

filed an administrative expense claim through the Effective Date in the Plan.

### Discharge of a Post-Confirmation Administrative Expense Claim

While the Plaintiff may have been able to file an administrative expense claim under the

terms of the Plan and relevant Bankruptcy Code provisions, the proposition that his failure to file

his post-confirmation claim as such therefore discharged and barred that claim pursuant to section

503 is less than clear. Many of the administrative expense claim cases cited by the Defendant do

not *require* that post-confirmation, pre-effective-date employment discrimination claims be filed

as administrative expense claims or be forever barred by virtue of Section 503. Of critical note, in

the cases relied on by the Defendant, the claim holders *affirmatively sought* payment by filing

administrative expense claims.[8] *See Reading*, 391 U.S. at 473–74; *Matter of Whistler Energy II,*

*L.L.C.*, 931 F.3d 432, 440 (5th Cir. 2019); *Collins v. J&N Rest. Assocs., Inc.*, 676 F. App'x 18, 20

(2d Cir. 2017); *In re 800Ideas.com, Inc.*, 496 B.R. 165, 168 (B.A.P. 9th Cir. 2013); *In re Goody's*

*Family Clothing Inc.*, 610 F.3d at 814–15; *In re Zilog*, 450 F.3d at 999; *Matter of P.C., Ltd.*, 929

F.2d 203, 204 n.1 (5th Cir. 1991); *In re Charlesbank Laundry, Inc.*, 755 F.2d 200, 201–02 (1st Cir.

---

[8] In the portion of Defendant's Brief in Support of its Motion, (ECF No. 32, at 17–18), where the Defendant argues in the alternative that section 1141 also discharges the claims here, the Defendant cites a case cutting against its argument under section 503. In *Mohammed v. Great Atl. & Pac. Tea Co., Inc.*, No. 13 CIV. 2248, 2014 WL 4058708 (S.D.N.Y. Aug. 15, 2014), *aff'd*, 607 F. App'x 77 (2d Cir. 2015), the court addressed a motion to dismiss a claim for employment discrimination. There, the plaintiff filed his complaint in the district court after the defendant's plan was confirmed and the effective date had elapsed. *Id.* at *1–2. Unlike here, that claim arose post-petition, but pre-confirmation. *Id.* The defendant argued that the claim was thus discharged by its bankruptcy. *Id.* at *1. Under the authority discussed above, it is evident that the *Mohammed* plaintiff could have sought payment for his claim as an administrative expense in the defendant's bankruptcy proceeding under the *Reading* exception. Notwithstanding that fact, the court did not dismiss the complaint for failure to file the claim as an administrative expense by the bar date, but under the normal discharge provisions of section 1141. *Id.* at *3. While the *Mohammed* Court used language seeming to indicate that the plan could discharge claims that arose up until the effective date, the claim there arose pre-confirmation and thus fell squarely within the language of section 1141, which discharges debts that "arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). In any event, the court never stated that the plaintiff's claim, by dint of arising post-petition and during the pendency of the bankruptcy, *had* to be filed as an administrative expense claim under *Reading*.

1985); *In re Eagle-Picher Indus., Inc.*, 278 B.R. 437, 446 (Bankr. S.D. Ohio 2002), *rev'd* 447 F.3d 461 (6th Cir. 2006); *In re Megafoods Stores, Inc.*, 163 F.3d 1063, 1067 (9th Cir. 1998); *Wiler v. Meridian Auto. Sys., Inc.*, No. 1:08-CV-21, 2008 WL 4682435, at *1 (W.D. Mich. Oct. 21, 2008); *In re B. Cohen & Sons Caterers, Inc.*, 143 B.R. 27, 27–29 (E.D. Pa. 1992) (citing *In re N.P. Mining Co., Inc.*, 963 F.2d 1449, 1454 (11th Cir.1992))*; In re Cont'l Airlines, Inc.*, 148 B.R. 207, 208 (D. Del. 1992). The central issue in these cases was not whether the underlying claims were barred by operation of Section 503 if not asserted as administrative claims, but whether the claimant was entitled to the priority payment of an administrative claim. A notable exception is *Sanchez v. Nw. Airlines, Inc., supra*, in which the plaintiff was not seeking to bring his claim as an administrative expense. However, unlike the situation here, the *Sanchez* plaintiff held a *pre-confirmation* claim and, in any case, the Court held that the plaintiff was not required to file an administrative expense claim due to defects in the notice to creditors. 659 F.3d at 673–74.

The *Sanchez* Court also cast considerable doubt over categorizing even pre-confirmation employment discrimination claims as administrative expenses for purposes of discharge. The court observed that *Reading* created a singular exception for administrative expense claims for the purposes of providing priority payment status for tort claims, but not for "purposes of dischargeability." *Sanchez*, 659 F.3d at 678 (citing *Boeing N. Am., Inc. v. Ybarra (In re Ybarra)*, 424 F.3d 1018, 1025 (9th Cir. 2005)). The purpose of administrative expense claims in the first instance is to encourage third parties to enter into contracts with bankruptcy estates in order to facilitate the rehabilitation of insolvent businesses. *Id.* at 677. In order to spur them to do that, their claims for payment are permitted to move closer to the front of the payment line by being denominated as "administrative expense claims." By contrast, in the discharge context the inquiry is into whether the debtor should be released from debts and provided a "fresh start." *Id.* at 678.

So, according the *Sanchez* Court, the *Reading* Court "arrived at its conclusion after balancing the objective of the debtor's rehabilitation against the desirability of allowing those injured by the operation of the business during the bankruptcy process to recover ahead of those for whose benefit the business was carried out." *Id.* at 677; *see also Pa. DER*, 178 F.3d at 691 ("The [*Reading*] Court's holding was motivated by the considerations of fairness and practicality which underlie the purposes of the bankruptcy laws. . . . The Court concluded that it simply is not fair to deny innocent victims compensation for injuries they would not have incurred had the law not allowed the debtor to continue operating its business."). "Thus, *Reading*'s rationale to benefit creditors with claims against the insolvent entity would be undercut, not furthered, by the rule permitting discharge of such claims if not submitted by the bar date created by the debtor." *Sanchez*, 659 F.3d at 678. That is the Eighth Circuit appeared to say, albeit in dicta, that the *Reading* exception to section 503 *permits* administrative expense *priority* for tort and/or statutory claims but should not likewise make them *dischargeable* by virtue of section 503.[9] And such would appear to be inconsistent with the Supreme Court's concerns of "fairness and practicality." *Pa. DER*, 178 F.3d at 691.

The Defendant submits other cases to support that administrative expense claims are "discharged" under section 503, as opposed to section 1141, and that bankruptcy courts and debtors may properly establish bar dates after which administrative expense claims are discharged. *See, e.g.*, *Collins*, 676 F. App'x at 20; *Eagle-Picher*, 447 F.3d at 465. However, those cases are inapposite here.

---

[9] The *Sanchez* Court ultimately did not have to make this ruling. The court based its holding on the fact that the notice the debtor served on the plaintiff excluded administrative expense claims for liabilities incurred in the ordinary course of business, not on whether his claim could be discharged under section 503. *Sanchez*, 659 F.3d at 679–80.

In *Collins*, the plaintiff, having had notice and an opportunity to respond to the debtor's reorganization plan, nonetheless affirmatively sought payment for a *pre-confirmation* administrative expense claim nearly a year after the date of confirmation. 676 F. App'x at 20–21.[10] Here, the Plaintiff possesses a *post*-confirmation claim and, for the reasons discussed in the following subsection of this Opinion, the pre-confirmation notices here did not bind him to the terms of the Plan here, or even put him in a position to assert his rights in the confirmation process since he then possessed no such claims as he had not been fired from his job. While the *Collins* Court appeared to express the view that a pre-confirmation administrative expense claims are not discharged by section 1141, *id.* at 20, the cases the *Collins* court cites for that proposition do not squarely support that proposition, *see In re Ames Dep't Stores, Inc.*, 582 F.3d 422, 429 (2d Cir. 2009) (noting that "requests for" and "allowance" of administrative expense claims are governed by section 503, but falling short of saying that 503 *actually discharges* any administrative expense claim); *Eagle-Pitcher*, 447 F.3d at 464–65 (discussed below); *Sanchez*, 659 F.3d at 677 (discussed above).

In *Eagle-Pitcher*, another case where the claims arose before confirmation, the court stated that section 503 "does permit *the parties* to establish a bar date by which time all administrative expenses must be asserted against the debtor or face discharge." 447 F.3d at 465 (emphasis added). However, like *Collins*, *Eagle-Pitcher* really does not fit here, because the Plaintiff here had no claim until after the Plan was drawn up by the debtor and later confirmed by the bankruptcy court. While *Eagle-Pitcher* appears to stand for the proposition that the "parties" can engage in pre-confirmation proceedings to establish a bar date, to which creditors would have the opportunity to object, one "party" here, the Plaintiff, had no reason to take any action to ensure his interests were

---

[10] *See also Collins v. J&N Rest. Assocs., Inc.*, No. 3:15-CV-178(BKS), 2016 WL 1248888, at *2 (N.D.N.Y. Mar. 28, 2016) (providing a more detailed factual background of the case).

represented until well after the ink was dry on WEC's Plan. *See infra* Part IV.2.b (discussing this issue in depth).

Further, *Eagle-Pitcher* does not explicitly state that the authority for discharging an administrative expense claim actually stems from section 503. Rather, the court stated that section 503 authorizes establishing a bar date after which a claim "could face" discharge. *Eagle-Pitcher*, 447 F.3d at 465; *see also Collins*, 676 F. App'x at 20 (citing *Eagle-Pitcher*, 447 F.3d at 461, 464–65, and *Sanchez*, 659 F.3d at 671, 677, for a similar proposition). In fact, there is some authority in this Circuit that while section 503 permits debtors to establish procedures and bar dates for filing of administrative expenses, the discharge is nonetheless effectuated by section 1141 and not section 503. *See In re Benjamin Coal Co.*, 978 F.2d 823, 827 (3d Cir. 1992) (citing solely to section 1141 and holding that "the discharge of all existing claims, *including administrative claims*, upon confirmation of a Chapter 11 plan is unambiguous both in the Bankruptcy Code and in [the debtor's] own reorganization plan" (emphasis added)); *In re Polysat, Inc.*, 152 B.R. 886, 893 (Bankr. E.D. Pa. 1993) ("administrative expense claim arising from the debtor's postpetition, preconfirmation use or possession of the tank cars was discharged pursuant to section 1141(d) of the Code upon confirmation of the debtor's plan.") (citing *In re Benjamin Coal Co.*, 978 F.2d at 827). And as discussed in the following subsection, the discharge provision of section 1141 does not reach the post-confirmation claims here.

For the forgoing reasons, while it may have been possible (although not conclusively so for the Plaintiff to file his discrimination claims as an administrative expense claim in order to try and obtain entitlement to priority payment, the Court concludes that the Plaintiff was not required to do so and his post-confirmation statutory discrimination claims are not extinguished by virtue of section 503 due to his failure to file them in the bankruptcy court by the Administrative Expense

Claims Bar Date. But that is not the end of the matter since the Defendant also relies on the provisions of section 1141 to seek to extinguish the Plaintiff's discrimination claims. The Court next turns to an analysis of that provision in the context of this case.

### b. *Section 1141*

Although the Defendant argues that Section 503 should control, it also claims that section 1141 discharges the instant claims. Section 1141(d)(1) provides that upon *confirmation* of the plan, the debtor is discharged from all debts "that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1). However, subsection (d) begins with the qualifier, *"[e]xcept as otherwise provided* in this subsection, *in the plan, or in the order confirming the plan*."[11] *Id.* (emphasis added). Here, the Plan did provide "otherwise." Section 11.3 of the Plan reads:

> Except as otherwise expressly provided in the Plan, **upon the Effective Date**, in consideration of the distributions to be made under the Plan, **each holder of a Claim or Interest and any Affiliate of such holder shall be deemed to have forever waived, released and discharged the Debtors**, Wind Down Co, and the Reorganized Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and **from any and all Claims, Interests, rights and liabilities <u>that arose prior to the Effective Date</u>**.

(Plan, § 11.3 (emphasis added).) Thus, the Defendant argues that the Plan's discharge provision properly extended coverage to any liabilities that arose *prior to the Effective Date*, thereby sweeping in the Plaintiff's claims here.

---

[11] Section 1141(d)(1) in its entirety reads:

Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the confirmation of a plan—

(A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not—

(i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;

(ii) such claim is allowed under section 502 of this title; or

(iii) the holder of such claim has accepted the plan; and

(B) terminates all rights and interests of equity security holders and general partners provided for by the plan.

But there a number of problems with the Defendant's argument. First, the Defendant has not shown or argued that there is any limiting principle to its reading of section 1141. Thus, taken to its logical conclusion, such an interpretation would permit a plan or confirmation order to push out its discharge timeframe for months or even years to a distant post-confirmation "effective date", so long as the bankruptcy judge approved that duration. As the Defendant stated, the span of four (4) months between the Confirmation Order and the Effective Date was primarily due to the intricacies of consummating the Plan Funding Agreement and the occurrence and timing of events over which the Plaintiff had no control at all. (ECF No. 32, at 4.) And, importantly, that effective date was not by any means a date certain, and was instead wholly dependent on the occurrence of one or more subsequent events, the timing of which were definitionally uncertain and outside of the control or influence of the Plaintiff. Were it to take one or more years for a debtor to reach the effective date, the Defendant would necessarily be arguing that every post-confirmation/pre-effective date claim—whether tort or statutory—would either have to be pursued only as an administrative expense or be discharged, even though the timing of that discharge date was wholly uncertain.

At the other end of the spectrum, applying the Defendant's argument, the same would logically hold true if the claim arose the very day before the Effective Date; e.g., that in this case, if the Plaintiff had been fired on July 31, 2018, he would not have known until receiving notice that the Effective Date was actually the next day. The only remedy in that instance, which the Defendant acknowledged at oral argument, would be for the plaintiff to forfeit his right to a jury trial under the ADEA and file an administrative expense claim within thirty (30) days—applicable administrative statutes of limitation for the underlying claim notwithstanding (which for claims arising in Pennsylvania, is 300 days after the alleged act of age discrimination if a complaint is

filed with the Pennsylvania Human Relations Commission[12]). That period of time, provided in the federal anti-discrimination laws to permit the EEOC and its parallel state agencies to investigate and seek to informally resolve such claims, would by virtue of a private party's bankruptcy plan be reduced by 90%, all without the involvement of the EEOC or any aggrieved party. Beyond the concerns that the Court has identified above, the Defendant's interpretation of section 1141 does not square with: (1) the Supreme Court's decision in *Holywell Corp. v. Smith*, as construed by our Court of Appeals in *In re Arctic Glacier*; (2) considerations of *res judicata* focused upon by the *In re Arctic Glacier* Court; and/or (3) available case law construing the temporal limits of the discharge provisions of section 1141.

**Holywell and In re Arctic Glacier**

While the Defendant may in theory be correct that discharge of the Plaintiff's claims would be a harsh but nonetheless permitted impact of the application of the Plan's provisions and section 1141, it would also seem to the Court that further definitive authority for that proposition must exist, at least in the context of a post-confirmation statutory discrimination claim, before that result obtains. The Court has located none, and the relevant caselaw strongly counsels the opposite outcome.

To the Court's knowledge, this precise question is unsettled and has not been directly addressed by our Court of Appeals. However, the Court's view that the Defendant's broad reading of section 1141 is problematic is echoed elsewhere, to include by the Supreme Court. In *Holywell Corp. v. Smith*, Justice Thomas, delivering the opinion for a unanimous Court, wrote, "[e]ven if § 1141(a) binds creditors of the corporate and individual debtors with respect to claims that arose

---

[12] *Cicchiello v. SEIU 1199P Union Serv. Employees Int'l Union, No. 361 M.D. 2015*, 2016 WL 1639015, at *7 (Pa. Commw. Ct. Apr. 26, 2016)

before confirmation, *we do not see how it can bind the United States or any other creditor with respect to postconfirmation claims.*" 503 U.S. 47, 58 (1992) (emphasis added) (noting parenthetically that "creditor" as used in section 1141 is defined in section 101(10) as an entity with various kinds of *preconfirmation* claims[13]).

The Plaintiff contends that this language concludes the issue in his favor. The Defendant argues the opposite, namely that the Supreme Court was speaking imprecisely in *Holywell*, and that that statement from that case is inapplicable here because the claim in *Holywell* arose not only after the plan's confirmation, but also after its effective date. (ECF No. 48, at 6 n.3.) Therefore, the Defendant says *Holywell* actually stands for the unexceptional proposition that claims arising after the *effective date* are not subject to discharge, notwithstanding Justice Thomas' focus on the confirmation date as the key measuring mark.[14] (*Id.*) And the Defendant's argument that *Holywell* has more limited applicability than the Opinion's actual language is not without support.

In a precedential Opinion, our Court of Appeals rejected the idea that *Holywell* prohibits bankruptcy plans from barring liability for *any* post-confirmation acts. *In re Arctic Glacier Int'l,*

---

[13] The Supreme Court cited 11 U.S.C. § 101(10) of the 1988 edition of the U.S. Code. The current version is not materially different in any respect.

[14] The Defendant proffers other cases in pursuit of its argument under section 1141. However, despite the language of those cases, which appear to advance the Defendant's argument that a bankruptcy plan can discharge claims that arise after plan confirmation and before a later effective date, all of those cases involved post-petition claims that arose *pre-confirmation*, rather than post-confirmation and pre-effective-date, as is the case here. *See McSherry v. Trans World Airlines, Inc.*, 81 F.3d 739, 740 (8th Cir. 1996) (claim arose in September 1992 and the plan was confirmed in August 1993); *Cost v. Super Media*, 482 B.R. 857, 859, 862 (S.D.N.Y. 2012) (claim arose in April 2007 and the plan was confirmed in December 2009); *Holmes v. Air Line Pilots Ass'n, Int'l*, 745 F. Supp. 2d 176, 187, 197 (E.D.N.Y. 2010) (claims arose in October 2006 and the plan was confirmed in April 2007); *In re Orleans Homebuilders, Inc.*, No. 10-10684 (KJC), 2017 WL 665953, at *1 (Bankr. D. Del. Feb. 17, 2017) (claims arose in June 2010 and the plan was confirmed in December 2010); *Mohammed v. Great Atl. & Pac. Tea Co., Inc.*, No. 13 CIV. 2248, 2014 WL 4058708, at *1 (claims arose in September 2011 and the plan was confirmed in February 2012). One case the Defendant cited involved claims which arose pre-petition. *Gilbert v. N. Am. Airlines*, No. 12-CV-523 KAM JMA, 2014 WL 1271057, at *7 (E.D.N.Y. Mar. 26, 2014) (claims arose in August 2011 and the debtor filed for bankruptcy in February 2012). Thus, notwithstanding the broad verbiage of those cases, they do not follow the same fact pattern as here and the Court thus finds them unpersuasive in answering the question presented.

*Inc.*, 901 F.3d 162, 166 (3d Cir. 2018).[15] In *Arctic*, the appellants had purchased shares from shareholders (or "unitholders") of the reorganized debtor after confirmation of its bankruptcy plan. *Id.* at 163–65. The appellants claimed to be owed a dividend under the bankruptcy plan's distribution scheme, but that they were not paid—actions which the appellants argued constituted post-confirmation conduct from which their claim arose. *Id.* at 165–66. Therefore, the appellants cited *Holywell* to argue that a bankruptcy plan can never insulate a debtor from liability arising from post-confirmation conduct. The Third Circuit rejected this argument. The *Arctic* Court held that the appellants were "transferees" of their claim, because they had purchased their shares from shareholders that were represented in the bankruptcy proceedings and had the opportunity to object to the plan prior to its confirmation. *Id.* at 167–68. Due to the fact that the initial shareholders were subject to the *res judicata* effects of the confirmed bankruptcy plan, any burdens imposed by the plan "ran" with the shares, so to speak. *Id.* at 168. Thus, the limitations on claims assertion that the appellants assumed upon purchasing the shares were as binding on them as transferees as they would have been on the initial shareholders. *Id.* (citing *In re KB Toys Inc.*, 736 F.3d 247, 249–52 (3d Cir. 2013)). Accordingly, the plan's terms controlled, which included waivers of liability for "all claims arising out of the bankruptcy, including distributions under the [p]lan." *Id.* at 167. The Court of Appeals also held that the forgoing did not offend considerations of due process. *Id.* at 168.

The *Arctic* Court also distinguished the facts of its case from *Holywell*, noting that *Holywell* involved a Chapter 11 plan that set up a trust and trustee to oversee liquidation of the debtor's property. *Id.* at 166. The plan in *Holywell* was silent as to whether the trustee had to file and pay taxes, and the trustee accordingly claimed that the United States, as a creditor, should have objected

---

[15] In their arguments to this Court, the Plaintiff did not cite to *Arctic*, and the Defendant did so only in passing. (ECF No. 60, at 2.)

to the plan if it wanted to preserve the right to collect taxes on income from the liquidation. *Id.* The Supreme Court rejected that argument, specifically noting that the tax liability itself arose after confirmation. *Id.* at 166–67. By contrast, the *Arctic* Court noted that the appellants in its case were directly challenging how the trustee *implemented* the confirmed plan by not paying out certain dividends the appellants said they were owed under the plan. *Id.* at 167. Thus, *Holywell*'s "facts, its language, and its logic do not apply to post-confirmation acts that carry out a bankruptcy plan," otherwise the *res judicata* effect of confirmed bankruptcy plans would be effectively nullified. *Id.* Therefore, a bankruptcy plan's terms can authorize or limit liability for post-confirmation acts that implement the plan. *Id.* This preemption of laws that would otherwise apply to the claims is permitted so long as the plan's preemptive scope in that regard covers laws related to "financial condition." *Id.* (citing 11 U.S.C. § 1142(a)) ("This is not to say that a plan's preemptive scope can be unlimited. The Code authorizes preemption of laws related to financial condition, but preemption beyond that line is suspect."). In sum, *Arctic* seems to stand for the proposition that a bankruptcy plan can, by virtue of section 1141, release/bar/discharge claims based on post-confirmation conduct if: (1) that conduct relates to implementation of the Plan; (2) the terms of the Plan release those claims; (3) the holder of the claim is bound to the terms of the plan under principles of *res judicata*, and (4) the preemptive scope of the Plan does not go beyond laws related to financial condition.

### *Res Judicata*

On the issue of *res judicata*, *Arctic* cuts in Plaintiff's favor, since "[w]hen a bankruptcy court enters a confirmation order, it renders a final judgment. That judgment, like any other judgment, is *res judicata*. It bars all challenges to the plan that ***could have been raised***." *Id.* at 166 (citations omitted) (emphasis added). Of course, the Plaintiff could not have known at the time of

the confirmation hearing that he would later have a discrimination claim against the Defendant, so he had no claim or objection to raise when confirmation occurred. Even after confirmation occurred, his claim did not arise for another two (2) months. Further, he did not acquire his claim from or stand in the shoes of a party that *did* have the opportunity to challenge the plan, as in *Arctic*. It was created by the post-confirmation conduct of the Defendant in dismissing him from employment.

Res judicata in this context was discussed in depth in the *WorldCom* bankruptcy cases. *Res judicata*, or "claim preclusion," only bars subsequent litigation if "(1) the prior decision was a final judgment on the merits, (2) the litigants were the same parties or in privity, (3) the prior court was of competent jurisdiction, and (4) the causes of action were the same." *In re WorldCom, Inc.*, 401 B.R. 637, 648 (Bankr. S.D.N.Y. 2009) (alteration omitted) (quoting *Corbett v. MacDonald Moving Servs.*, 124 F.3d 82, 88 (2d Cir. 1997)); *see also CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 194 (3d Cir. 1999) ("Claim preclusion requires: (1) a final judgment on the merits in a prior suit involving; (2) the same parties or their privities; and (3) a subsequent suit based on the same cause of action.").

The *WorldCom* Court analyzed whether *res judicata* bound a creditor's bankruptcy trustee (who held a post-confirmation/pre-effective-date claim) to the terms of WorldCom's bankruptcy plan. *Id.* at 647–51. After the WorldCom plan was confirmed but before its effective date, a petition for involuntary Chapter 7 bankruptcy was filed against one of WorldCom's creditors, OneStar. *Id.* at 640. Sometime later, a trustee was elected to manage OneStar's bankruptcy. *Id.* Prior to OneStar's involuntary petition, a WorldCom subsidiary provided telecom services to OneStar, for which OneStar continued to pay after WorldCom filed its bankruptcy petition. *Id.* The OneStar trustee sought avoidance and recovery of some of those payments in an adversary proceeding in

another court, which stayed the matter pending the outcome of the *WorldCom* decision. *Id.* The
*WorldCom* Court had to determine if the OneStar trustee was bound by the discharge provisions
of the WorldCom plan. The court tee'd up the central question as: "whether a bankruptcy trustee
seeking to pursue an avoidance action is bound by the notice of the confirmation order that the
debtor [OneStar] received in another bankruptcy case [WorldCom's], when the debtor received
the notice before it became a debtor by its filing of a bankruptcy case while it was a creditor in that
other bankruptcy case." *Id.* at 641.

Ultimately, the court concluded that the plan *could not bind* a party that was neither the
same party nor in privity with a party to the bankruptcy proceedings leading up to confirmation.
There, the OneStar trustee and OneStar were not the same party or in privity, nor was the OneStar
trustee a successor in interest of OneStar. *Id.* at 644. While the relationship between the parties
here is far less complex, applying *WorldCom* here, the Plaintiff would  not bound by the Plan for
similar reasons—he was not a creditor, holder of a claim, or otherwise a party, at the time that the
bankruptcy court entered its Confirmation Order. Further, the Plaintiff is not in privity with any
such party, since broadly speaking, "privity is defined as mutual or successive relationships to the
same right of property, or such an identification of interest of one person with another as to
represent the same legal right." *Greenway Ctr., Inc. v. Essex Ins. Co.*, 475 F.3d 139, 149 (3d Cir.
2007). The Defendant has not proffered any record facts that demonstrate privity between the
Plaintiff and a party to the bankruptcy matter prior to confirmation such that the Plaintiff would
be bound by virtue of privity and *res judicata* to the Confirmation Order and the Plan, nor would
such logically exist as a result of the Plaintiff's post-confirmation discrimination claim. Without
demonstrating the Plaintiff was a party or in privity with a party, it is "axiomatic" that he did not

have a full and fair opportunity to weigh in on the Plan's provisions prior to the Plan confirmation. *Id.* at 151.

The fact that the Plaintiff received notice of confirmation proceedings is not enough to carry this argument for the Defendant in this instance. "Under fundamental notions of procedural due process, a claimant who has no appropriate notice of a bankruptcy reorganization cannot have his claim extinguished in a settlement pursuant thereto." *Jones v. Chemetron Corp.*, 212 F.3d 199, 209-10 (3d Cir. 2000). Of course, the Plaintiff here admits receiving the first two notices relating to the Proofs of Claims, the General Bar Date, and the confirmation hearing. However, in *Wright v. Owens Corning*, our Court of Appeals at least implicitly held that if a potential claimant correctly believes it does not have a claim prior to the confirmation, then generalized notice alone is insufficient to bind the Plaintiff to the Plan's terms. 679 F.3d 101, 108 (3d Cir. 2012). The *Wright* Court held that while the publication notices issued in its case were sufficient for most unknown claimants, the notice was insufficient as to the plaintiffs in that case because they did not know they had dischargeable claims at the time they received their notices. *Id.* In *Wright*, the claims at issue arose from an intervening change in Third Circuit law, after which the plaintiffs "unexpectedly [held] 'claims' that arguably could be discharged in the proceedings addressed in the notices." *Id.* However, by the time the law changed and the plaintiffs realized they had "arguably" dischargeable claims, the bar date had passed and the plan was confirmed. *Id.* Because the *Wright* plaintiffs accurately believed that their claims were not affected by the bankruptcy under then-current law, they, "correctly, would not have taken any action to ensure that their interests were represented." *Id.* So, the court fashioned a rule that "for persons who have 'claims' under the Bankruptcy Code based solely on the retroactive effect of the [intervening] rule

announced in *Grossman's*, those claims *are not discharged when the notice given to those persons was with the understanding that they did not hold claims*." *Id.* (emphasis added).

Thus, by extension of the reasoning in *Wright*, the two pre-confirmation notices that the Plaintiff received here were also insufficient to bind him to the Plan because he would have correctly believed that he did not have a claim at the time he received the pre-confirmation/pre-employment-termination notices. Simply put, the Plan and Confirmation Order are not *res judicata* as to the Plaintiff because he was not a party or in privity with a party to the bankruptcy proceedings leading up to confirmation, *and* because he received the pre-confirmation notices at a moment in time when he did not have a claim and thus had no reason to take "any action to ensure that [his] interests were represented." *Id.*

However, even if the Plan were binding on the Plaintiff, the Court still concludes that the terms of the Plan do not discharge the Plaintiff's claims under section 1141. Here, more akin to *Holywell* than *Arctic*, the post-confirmation conduct that is the foundation of the Plaintiff's claim (his termination of employment) had nothing to do with "implementation" of the bankruptcy plan. Whereas the bankruptcy trustee (or "monitor") in *Arctic* was set to make distributions to the shareholders under the terms of the plan—distributions that did not occur and were thus the genesis of the claims being asserted—no provisions of the Plan in this case made "firing Timothy Ellis" part and parcel of the Plan's implementation. *See Arctic*, 901 F.3d at 167 ("Unlike the [appellants] here, the government in *Holywell* did not directly challenge how the trustee implemented the plan."). The Plaintiff's claims of discrimination facially have nothing to do with the implementation or accomplishment of any provision of the Plan. Put another way, the Plaintiff's claim did not arise out of the bankruptcy itself, as in *Arctic*, and they did not arise from or relate to laws regarding the bankrupt's financial condition, as was the case in *Arctic*.

***Temporal Limits of Section 1141***

Furthermore, unlike the *Arctic* plan's discharge of "claims in any way related to the bankruptcy" provision, section 11.3 of the Plan which the Defendant highlights here does not, by its terms, mandate the discharge of the instant claims. At the end of the day, no matter the wording of section 11.3 of the Plan, the provision nonetheless states that it applies "to the fullest extent ***permitted by section 1141*** of the Bankruptcy Code." (Plan, § 11.3 (emphasis added).) Putting aside the hypothetical permissible reach of Justice Thomas' broad language in *Holywell* in the present matter, at least two other courts have expressed substantial doubt that section 1141 permits temporal expansion of the debtor's discharge protection via the definition of an extended "effective date" by virtue of terms of the plan of reorganization, at least in the context the Defendant advances here. That is, those courts have declined to hold that the "except as otherwise provided . . . in the plan" language in section 1141(d)(1) permits a debtor to discharge debts other than "any debt that arose *before* the date of such confirmation." 11 U.S.C. § 1141(d)(1) (emphasis added).

The Ninth Circuit in *Zilog* suggested that the more plausible reading of section 1141 is that the "except as otherwise provided" language refers to "any debt" and not to a power to indefinitely extend the discharge date under section 1141 by setting a later arriving effective date. The *Zilog* Court addressed this question in a footnote:

> We are uncertain whether post-confirmation debts can in fact be discharged in bankruptcy. The "[e]xcept as otherwise provided" clause in section 1141 can be read in either of two ways. One way would be to read the clause as modifying the words "any debt." Under that reading, all pre-confirmation debts are dischargeable, except as limited by the plan or the code. Alternatively, one could read the "[e]xcept as otherwise provided" clause as modifying the phrase "before the date of such confirmation." Under that reading, even post-confirmation debts could be discharged if that were provided for in the reorganization plan.
>
> We have not located a case addressing which reading is correct. Nor have we found an answer in the statute's legislative history.

> *Although we find the first alternative more plausible*, we need not
> decide the matter here.

*Zilog*, 450 F.3d at 1001 n.5 (citations omitted).

While the Ninth Circuit demurred, the United States Bankruptcy Court for the Western

District of Michigan more directly rejected the Defendant's interpretation as advanced here. In

*Matter of Holly's, Inc.*, the court took the same view as the Ninth Circuit expressed and held,

"Section 1141(d)(1) allows the Plan to except certain preconfirmation debts from discharge; it

does not empower the Debtor to rewrite the Code and discharge debts that arise postconfirmation."

*Matter of Holly's, Inc.*, 172 B.R. 545, 561 (Bankr. W.D. Mich. 1994), *aff'd sub nom. In re Holly's,*

*Inc.*, 178 B.R. 711 (W.D. Mich. 1995). The *Holly's* Court expressed the same difficulties that this

Court has with the Defendant's interpretation:

> This analysis comports with common sense and notions of due
> process. For example, suppose the only debt owed by the Debtor to
> Kentwood were one arising on the effective date of the Third
> Amended Plan. Under this scenario, Kentwood would have had its
> debt discharged without any notice of the discharge. Kentwood
> would not have been scheduled by the Debtor. After all, how could
> the Debtor schedule a creditor that did not even exist at the time of
> the bankruptcy filing? In addition, Kentwood would not have filed
> a claim by the bar date established by the bankruptcy court. As a
> result, Kentwood would not have been able to vote on the plan of
> reorganization or object to the fact that the plan of reorganization
> would seek to discharge its prospective debt without providing
> Kentwood with the right to any payment on that debt.
>
> *Thus, this court concludes that the Bankruptcy Code establishes*
> *the date of confirmation, not the effective date, as the post-filing*
> *cleavage date for chapter 11 dischargeable claims.* Any claim that
> arises after confirmation is by definition a postconfirmation claim.
> Delaying or making conditional the operation of the effective date
> or the Debtor's discharge does not alter the date of confirmation and
> the nature of the claims that arise after that date.

*Id.* (citations omitted) (emphasis added). This reading is consistent with the broad language in

*Holywell,* and with the analysis of our Court of Appeals in *Artic*. This Court agrees and concludes

that the Defendant's interpretation of section 1141's "as otherwise provided" provision is not borne out by the case law, and the Plan does not discharge the Plaintiff's employment discrimination claims that arose post-confirmation. And the *Arctic* case, for the reasons discussed above, does not change this outcome.

## V.    CONCLUSION

The Bankruptcy Code does not empower the Defendant to in essence make the Plaintiff "an offer he can't refuse" by discharging post-confirmation claims that arose prior to the more distant and wholly uncertain effective date of the plan. And in these circumstances, sections 503 and 1141 do not require that the Plaintiff's statutory discrimination claims arising post-confirmation be filed as priority administrative expenses or else face discharge. While bankruptcy can be unforgiving in its pursuit of providing a "fresh start," the temporal limits of discharge are not unbounded and in the Court's estimation, cannot be extended simply by virtue of a distant "effective date" as has been argued here. Simply put, in the circumstances present in this case, the Plaintiff was not forced to file his statutory discrimination claims, which arose post-confirmation, within weeks of his claimed injury, or face losing all recourse. For the foregoing reasons, the Defendant's Motion for Summary Judgment, (ECF No. 31), will be denied, and on this issue, summary judgment will be granted in favor of the Plaintiff.

But, for the reasons noted above, this issue is certainly a "gateway" issue in this civil action and is one that occupies the intersection of two vital federal statutory schemes of importance to American society. As noted above, one of the central principles underlying the uniform bankruptcy system under federal law is the conclusive wrap up of the debtor's financial challenges, and the provision of a "fresh start" unencumbered by those obligations discharged via the bankruptcy process. Conflicting with those principles in this case is the mission of the federal (and

supplemental state) anti-discrimination laws to both eradicate unlawful discrimination were it to occur, and to provide an administrative mechanism for the resolution of such claims by a federal agency so charged, or, if necessary, in the federal courts. That intersection of important statutory schemes generates a legal issue that can easily arise again in the context of bankruptcy proceedings yet to be filed. From the Court's perspective, it is certainly a "controlling" question of law, one as to which there is a "substantial ground" for difference of opinion, and in the Court's estimation, given its "gateway" nature, an immediate appeal from this Court's Order may materially advance the ultimate termination of the litigation. *See* 28 U.S.C. § 1292(b). And, in the Court's judgment, it is a legal question of considerable significance to the sound administration of both federal bankruptcy law and federal anti-discrimination laws. Therefore, the Court's Order will include in its Order a certification of such for immediate interlocutory appeal to the United States Court of Appeals for the Third Circuit pursuant to 28 U.S.C. § 1292(b), specifically as to the following controlling question of law:

"Where a plaintiff's claim under the Age Discrimination in Employment Act (and parallel provisions of state law) arises after the confirmation of an approved bankruptcy plan of reorganization, but prior to the effective date of the plan and the vesting of the bankruptcy estate as set forth and defined in such plan by order of the bankruptcy court: (1) is the plaintiff's claim barred by the provisions of 11 U.S.C. § 503 if the plaintiff did not file such employment discrimination claim as a claim for an administrative expense prior to the post-confirmation administrative claim bar date under the plan; and/or (2) is such employment discrimination claim discharged by the provisions of 11 U.S.C. § 1141, and/or under the principles of *res judicata*, if such claim was not filed in the bankruptcy court prior to the post-confirmation effective and discharge dates set out in the plan?"

To permit the process contemplated by 28 U.S.C. § 1292(b) to play out, all further proceedings in this civil action will be stayed to the date falling fifteen (15) days after the date of this Court's Order, to permit the Defendant to file a petition for permission to appeal pursuant to § 1292(b) should it elect to do so. Should the Defendant file such a petition for leave to appeal, then such stay shall continue in full force until the later of fifteen (15) days after the denial of any such petition for leave to appeal by the Court of Appeals, or, if such petition is granted by the Court of Appeals, until such later date as may be ordered by the Court of Appeals or this Court. The Defendant shall promptly file a notice on the docket in this civil action of the filing of any petition for leave to appeal that it files under § 1292(b) or of its election to not file such a petition, and a second notice of the action of the Court of Appeals on any such petition.

                                         Mark R. Hornak
                                         Chief United States District Judge

Dated: August 5, 2020

Cc:     All counsel of record